The final case on the calendar for argument today is Sona v. Golubowski Counselor, can you hear us? Yes, Your Honor. All right, counsel for appellate, please proceed. Thank you, Your Honor. May it please the court, my name is Deborah Clark-Weintraub and I represent the appellants. With the court's permission, I'd like to reserve three minutes for rebuttal. As this court has repeatedly explained in its authorities, offering documents are misleading if they affirmatively create an impression of a state of affairs that differ in a material way from the one that actually existed at the time of the IPO, including by touting positive information to the market while withholding adverse information that cuts against the positive. That is precisely what happened here, Your Honors. The offering documents here stated that Robinhood's Q2 2021 revenue was expected to be in the range of $546 to $574 million. However, the usual and customary details that Robinhood provided for revenue information with respect to every other financial period discussed in the offering documents was not disclosed with respect to this Q2 2021 revenue range. And this was significant, Your Honors, because in Q2 2021, which was the last completed quarter before the July 31, 2021 offering, each of the three components of Robinhood's transaction-based revenue, along with important key performance indicators that were correlated with revenue, were declining. Counsel, let me ask you this. You have a lot you could tell us, lots of complicated facts here. But as I understand, Section 11, the misleading regarding omission, you only need to state interim results if they are, in quotes, an extreme departure from the previous ones. Do you agree that that is the standard under Section 11? We do not, Your Honor. You do not. Okay. And why is that? As we explained in the brief, we believe that the extreme departure standard is the incorrect standard because, first of all, with respect to our item 303 claims, the item 303 regulation itself sets forth the specific standard. And that is not an extreme departure. Item 303 specifies that no trends or uncertainties with respect to financial results that are reasonably likely to have a material effect, favorable or unfavorable, on the registrant's financial condition must be disclosed. All right. Let me ask you this, then. Do you believe that your 303 argument, in order to be successful under Rule 11, your 303 argument has to be, has to win, basically? Do you agree with that? No, Your Honor. No, Your Honor, we don't. Because, of course, in our view, the omissions here rendered the offering documents, the statements in the offering documents, materially false and misleading. And whether or not that interim information had to be disclosed in the offering documents should not be judged by this extraordinary departure standard. So, I want to make sure I understand this whole situation. Putting aside 303 for a moment, the court below adopted the extreme departure standard, but as far as I'm aware, there's no Ninth Circuit decision adopting that standard. It's a new question for the Ninth Circuit. The First Circuit adopted that standard. The Second Circuit rejected that standard. So, it's a new question for us. Do I have that part right? Yes, Your Honor, that is correct. There are some lower courts in the Ninth Circuit, including the District Court here, that have applied the extreme departure standard, but thus far, the Ninth Circuit has not. And that was cited by the court. There's other decisions, but it therefore only cited District Court opinions. And then, with respect to 303, there, correct me if I'm wrong, even the First Circuit has not said that the extreme departure standard applies there. But the District Court here applied that standard without citing any case, I think, to support the use of that standard in the 303 context. Your Honor, I believe the latter statement you made is correct with respect to what the District Court did here. Honestly, I did not research the issue, so I don't know whether or not the First Circuit has applied the extreme departure standard to item 303. But this court, in the NVIDIA case, acknowledged that item 303 contains its own standard. So, this court has already decided that issue. The extreme departure standard is not the standard that's in item 303. And therefore, that was a clear error on the part of the District Court applying that standard with respect to the item 303 claim. Now, if, assuming for the sake of argument, that we agree with you that the extreme departure standard should not govern in either context, does, isn't the best thing for us to do is to send the case back to the District Court to have the court reevaluate what was disclosed or not disclosed under what we would then say is the proper state? Your Honor, that is certainly an option that is within this court's discretion. However, we do not believe that it's required because the decision below was on a purely legal issue, whether or not, as a matter of law, there was a duty to disclose all of these omitted financial indicators in the offering documents. Since this court is deciding this de novo, there's no reason to send it back to the District Court. And in this particular case, which, as Your Honor is aware, is a PSLRA case where there is a stay of discovery, we've already had two rounds of motion to dismiss briefing in front of the District Court. We believe that the better course would be for this court to decide the issue, assuming it agrees with the plaintiff, with the appellant, excuse me. But again, Your Honor, that's within this court's discretion. But to Judge Rakoff's point, if we were to decide it the way you indicated, you'd still need to have it send it back to the District Court, at least insofar as the item 303 approach, right? Well, in terms of whether or not the standard, the District Court applied here, extreme departure. No, I haven't. Forgive me. Perhaps I didn't state it right. Let's assume, arguendo, that we agree with you that the extreme departure standard doesn't apply, but under item 303 that you have stated a cause of action. You would still want it to send that back, reverse and send that back to the District Court, would you not? Yes, of course, Your Honor. Okay. I just want to be sure I understood you correctly. Yes. I'm sorry. I misunderstood what Your Honor was saying. I didn't state it right, maybe. And Your Honors, in terms of the standard, as Judge Rakoff observed, the Second Circuit has rejected the extreme departure standard in a couple of decisions, and it has provided helpful, I think, analysis as to why the standard is not appropriate to apply in this context. In fact, the Second Circuit referred to the standard as unsound for a number of reasons. First and foremost, the Second Circuit held that the standard is unsound because it fails to examine the omitted interim financial metrics together and as a whole in the context of the total mix of information, which is critical. And that is illustrated here in the District Court's decision. The District Court meticulously ticked through the omitted metrics one by one, finding that each one was not extraordinary in isolation, but failed to consider whether all of the omitted declines taken together and considered as a whole either reached that threshold or even rendered the offering documents not misleading. The second reason the Second Circuit found that the extraordinary departure test was unsound was because it said that it leaves far too many open questions, including the degree of change necessary to find an extreme departure and which metrics the court should look at in assessing whether or not that departure has occurred. And indeed, both of those open questions cited in the District Court, I'm sorry, the Second Circuit's decision, and that's in the Stadnick v. Vagonsola case, played a prominent role in this case in the District Court's erroneous decision to dismiss this case and to find that as a matter of law, there was no duty to disclose. The District Court held that the degree of change in the omitted metrics in this case, which were equivalent to or indeed, sometimes far in excess of declines that other courts have found to satisfy the extraordinary departure standard, were insufficient to give rise to a duty to disclose in this case. And it did so because it determined that Q1 and Q2 financial results were not an appropriate benchmark from which to measure whether or not the declines met the extraordinary departure standard because the Mean Stock event and the Dogecoin rally had occurred in those quarters. The District Court found that when compared to periods before these events occurred, the metrics, the omitted metrics were not so extraordinary as to warrant a disclosure because he found that they represented simply a fluctuation back to the mean in light of these two bubbles, as he called them. But that conclusion that this was nothing more than a reversion to the mean was flawed for a couple of reasons. First, because the Mean Stock event began and ended in the first quarter of 2021, the decline in equities trading and trading revenue in Q2 2021 to a level below what had been since Q1 2020, a full year before, cannot be explained as a reversion to the mean as the result of the disappearance of the Mean Stock event. Something else was afoot. And indeed, the Second Circuit, I'm sorry, the Second Amendment Complaint, forgive me, contains allegations based on accounts from several confidential witnesses that customers were leaving Robinhood's platform in 2021 due to issues with customer service, security issues, and also platform outages. The District Court never considered these allegations. And more importantly, the District Court's reversion to the mean analysis ignored the crucial issue of whether or not a reasonable investor could have been misled, nevertheless. As the 11th Circuit stated in Oxford Asset Management v. Jaharis, you know, there can't be a situation where booming sales due to an event carried an issuer for a couple of quarters, but then those sales disappear. And if interim declines are not disclosed, that can mislead investors. And that is the case here. It is more than plausible that including preliminary estimated top-line revenues for Q2 2021 in the offering documents without disclosing the precipitous declines in so many financial metrics in the months preceding the IPO could have misled a reasonable investor. I see I only have two minutes left, Your Honors, and unless you have questions, I'd like to reserve that time for rebuttal. All right. Thank you, Counsel. Mr. Orsini? Good morning, Your Honors, and may it please the Court. Kevin Orsini on behalf of the Robinhood defendants, arguing on behalf of all defendants. I'd like to start with going to your question, Judge Rakoff, to counsel, which is, isn't it the case that there is no Ninth Circuit decision adopting the extreme departure test? I completely agree with counsel. The answer to that is no, there is no Ninth Circuit case adopting that issue, adopting that standard. I also agree with counsel that the Second Circuit, which is, you know, closer to both Your Honor and me currently, has rejected that standard. But I think the critical point here, the critical point is... Well, the record should reflect that I frequently disagree with the Second Circuit. I am shocked. Let the record show that I am shocked. Let the record show I refuse to comment on that record. But, Your Honor, I think, and all of Your Honors, I think the critical point here is, if you look at the various cases, the ones that adopt this extreme departure standard, as well as the ones that either don't talk about it or that reject it, in our view, we don't need the extreme departure test to prevail here. Because all we... So that comes to the follow-up question I put to your adversary. Yes, Your Honor. Assuming we think that the standard should be the Second Circuit standard, for lack of a better way to put it, should we then send it back to the district court? Because you make the argument that under either standard, there was still no violation of Section 11. And there would be some benefit, since the district court has detailed familiarity with this case, of letting the district court take a look at that issue rather than us. Wouldn't that be the more sensible way to proceed? That's obviously one possible approach, Your Honor. Here, I actually agree with Ms. Weintraub that it's not necessary. Because if we look at what the district court did, and we look at the careful analysis that the district court set forth, and more importantly, we look at what's actually in the registration statement, I think it's clear as day and perfectly appropriate for this court to conclude that there is no Section 11 claim here. And why do I say that? I say that because we all know materiality alone is not enough. You don't have to disclose information just because someone would like to know. Section 11 provides the framework here in the statute itself, where it says there's a cause of action in two scenarios. You have a freestanding duty to disclose and you don't meet it, such as item 303. Or something you have affirmatively said has been rendered misleading by the omission. And in our view, if you look at the cases, the extreme departure standard is just a framework through which to analyze this, or a lens through which to view that question. But if we look at the facts as pled in the complaint, and we look at the registration statement, just dialing back to the macro level, there are two different tales here. The plaintiff's case turns on convincing either this court or the court below that a reasonable investor, looking at Robinhood's IPO five and a half months into 2021, would believe that there's going to be unbridled growth from the performance in those first five months of the year. That's the plaintiff's case, that people didn't fundamentally understand that it was a bubble, two bubbles, that had burst, and that the future trajectory of this company was not growing off that base. That's their claim. If you look at the registration statement itself, your honors, we said precisely the opposite. And at the end of the day, that's what the court below was really analyzing, and what the court below really concluded. Because quite contrary to this idea of unbridled growth, we disclosed, and this is the key disclosures in our view, your honors, are on 123 and 124 of the excerpts of the record. We told our investors, we told our investors that in the third quarter, we expected revenues to decline from the ongoing second quarter when the IPO occurred. Why? We told investors why. We told them that there had been this extraordinary trading in the first quarter in the meme stock, that's throughout the disclosures. And we told them that for the second quarter in particular, it was driven, the blowout performance in the second quarter was driven by this extraordinary frenzy in crypto trading. It's four years later, so it's not as fresh for all of us. But the biggest news stories of the year back then were the meme stock event and the crypto boom. And they talk about there not being awareness of customer complaints. I'm not saying that we can rely entirely on what was in the public record. We can rely on what's in our disclosures. But what a reasonable investor knew is obviously relevant to this in case after case says that. And what a reasonable investor knew, including because of our disclosures, was that quarter one was an absolute black swan event. There were congressional hearings. There were dozens of lawsuits filed against Robinhood related to the trading stops in the meme stock event. Those are disclosed in the prospectus. We even had both AOC and Ted Cruz simultaneously coming out against Robinhood, right? When you have the two of those individuals joining together to express dissatisfaction, the idea that a reasonable investor didn't understand that there was dissatisfaction, I think, blinks at reality. But what we disclosed in particular, again, on 123 and 124. Mr. Cruz, you're referring to the well-done critic of Mr. Trump, is that right? When you look at what we disclosed on 123, Your Honors, we said, not unbridled growth, revenue will go down. The third quarter will go down. Now, did we give the granularity of options versus equities? Not in a chart. But we also said that if you look at the second quarter of 2021, and again, this is on 123. If you look at that quarter, the results, the blowout results that we said would not be repeated. Why did those occur? We say specifically because of increased trading in options and cryptocurrency, and flat equity as compared to the prior year. That tells a reasonable investor, first of all, they don't know the specific breakouts, and they shouldn't expect to understand those because we're not disclosing them, and we're not required to. So if I, forgive me for interrupting, but doesn't that make it even more relevant, the undisclosed interim results which show a further decline, if I have that right? And isn't it true that with respect to Section 303, at least, that that would have to be disclosed if it showed increased uncertainty? So, Your Honor, I think the answer to that question is none of the allegations here about the ongoing declines, which were not of long duration. We're talking a month and a half of a month, right, in the ongoing quarters. Those were not a trend that is required to be disclosed I mean. But trend is not the only thing that has to be disclosed, is true. That's all that the district court analyzed. But the statute, the rule goes further, includes uncertainties, does it not? It does talk about uncertainties, Your Honor. But again, I think. So for example, if I, two days before I issued my IPO, learned that my main customer was uncertain as to whether he wanted to remain my customer or go with one of my competitors, even though that would not be a trend in any sense, under 303, I would still have to disclose it, right? Your Honor, the 303 cases I've seen do focus on the trends, not a specific uncertainty. But I think that the analogy, it does say known trends or uncertainties. The fundamental point of 303 is, and this also relates to this question of whether or not the omission rendered what we said misleading. Is the investor getting a fair picture of what the risk profile is of this company and the growth trajectory? And I think if you look at Judge Rakoff, your decision in Niani, right, I think that is a useful contrast for facts and is actually much more square on with your hypothetical than what we have here, which is the opposite. Because in Niani, and I always hesitate to talk to a judge about his or her decision, but I'm going to do it anyway, your Honor. In Niani, my understanding and my read of your decision in the complaint was that the single important metric that was being touted by this issuer was that they had a higher than industry average position retention rate. And this was like the critical investment thesis. And in fact, in the immediate run up to the IPO, that retention rate had dropped precipitously. When it's disclosed, the bottom falls out of the company and you've got a fundamentally different investment than you thought you did. Right here. The only way those facts would be analogous is if the registration statement could be reasonably read to tell a reasonable investor that the business you're buying is one that's continued to perform like Q1. And in particular, based on Ms. Weintraub's argument and their allegations, Q2. But we said the exact opposite. We said Q3 will be low. We said that crypto was taking on a much, much higher share of our revenue and our trading than it ever had before. We disclosed in the offering documents at 170 and 171, that crypto had been 4% at the end of the prior year. In Q1, it was 17%. And we did disclose that there was going to be, there was even a higher, historic was the word we used on 123, historic levels of crypto trading during the second quarter. And we also told our investors in the offering documents that what happened was in the end of the second quarter, you know, in the month of June, continuing into July, as this IPO goes live, those trading levels were coming down from historic highs. We then published our 2Q, you know, 10Q for 2Q after the IPO. The numbers were spot on in the range we had told investors, which was the blowout numbers based upon this crypto boom. And then when we get to the third quarter, we were also right directionally, right? We didn't give them a number for third quarter, but directionally, we were right. It was down hundreds of millions of dollars from that black swan second quarter. And critically, again, this is what's different from Niani, your honor. I think it's what's different from the Apple case they cite and every other case they rely on. Investors here were not buying a pig in a poke. They saw and they bought a company that they knew was going public at the moment of this frenzy. We told them the frenzy was already going away. We told them revenues would go down. And when we actually get to our third quarter, our third quarter results, they were lower than the second quarter. Just as we said, they're still higher than before these two bubbles. And that's what the district court was focused on. You can't say that a reasonable investor reading these prospectus documents would conclude I'm buying Robinhood because I love its first five months of 2021 performance. We told them you cannot do that. We told them it's going to go down. We told them crypto was fueling this. We told them equities was flat. And even still, by the time those bubbles were gone, they were getting a company that had grown even compared to the pre-bubble levels that we disclosed in our prospectus. And so back to your question, your honor, Judge Rakoff on 303, uncertainty. We disclosed the uncertainty. We did so qualitatively, right? We did so by telling our investors in 122, 123, 170, and 171, and various other places throughout the prospectus, do not expect us to be the company we were in the second quarter. Expect us to have lower revenue. Expect the crypto trading to drop. Expect that our equities trading has been flat as compared to the entire year preceding quarter. And we believe your honors, based upon the totality of those disclosures, whether you call it extreme departure, which we think is a valid test and we think has validity and is a helpful framework. But again, you can disagree with me on that. You can disagree with Judge Chen on that. We believe that if you look through the carefully constructed opinion he had, it is dead right for issue. What was misleading? Nothing. The story that we told investors was exactly the story that proved to be true. The risks were exactly the risks we disclosed. We explained in the prospectus that we had a ton of new customers. That means stock bubble in January, February brought a whole kludge of people driven by social media onto Robinhood's platform. We told our investors in the prospectus they were new customers. We had no idea how they were going to trade going forward. And if they didn't trade as our historical customers did, that could affect our performance. And so I see I'm running out of time here. I'll just close with the basic principle. We believe if you adopt extreme departure, it's clear we win. If you don't want to bring extreme departure into the ninth circuit, we still win. And we the disclosures did provide a fair recitation, quantitatively and qualitatively, of what the investors ought to expect. And a reasonable investor, because of the disclosure regime, cannot and should not expect the disclosure of all of the nitty-gritty of the ongoing periods in a registration document, certainly absent misleading information. Just one last question, forgive me. On the extreme departure point, I get your basic point. You think you win either, whichever standard applies. But one problem that the second circuit has with the extreme departure is that it's very difficult to define. Isn't that a valid criticism? That's exactly what the second circuit did say in Stadnick, Your Honor. The securities laws are, there are a lot of different standards that are a little bit difficult to define at times. But I think what the second circuit was saying there, as I understood the Stadnick decision, what they were saying there is like, we don't want to be cabined in on this idea of it being an extreme departure. What does extreme mean, right? And if it's a one-time event, like Your Honor posited the hypothetical of losing that key customer, or what Your Honor saw in deciding the motion to dismiss in Niani, is that going to be too narrow of a lens through which we should view? What is the fundamental question we all agree on? Because it comes from section 11. And that is, is something we said misleading because of something we didn't say. And I read the second circuit as saying, you know, that's something judges understand. Or at least it's something judges have more experience with, especially at the district court level, because it's a standard writ large, you know, including in 10B context. Yeah, it's been around for a long time. Precisely, Your Honor. And so, you know, again, I think I understand that criticism. I nonetheless think in the context of interim financial results, because of the reporting requirements that's been set up by the SEC, or not required more directly, which you don't have to disclose interim results. The extreme departure test really just gives teeth to the idea of, you know, the reasonable investor knows they're not getting instantaneous dashboards into the company. But again, am I buying the pig in the poke? Is there something going on here that's so fundamentally different from what I expect that I'm making a misleading financial decision in investing in this company? That's all I have to say, Your Honor. All right, Reboto. Thank you. Thank you, Your Honor. I'd just like to use the time I have remaining to address the specific statements that Mr. Orsini is relying on as giving these warnings to investors. But let me first say the notion that these offering documents somehow warned investors that Q1 and Q2 results were complete aberrations not to be relied on cannot be reconciled with what is said in the offering documents. And I think it's important to look at the specific statements Mr. Orsini is talking about. So, the first one, he discussed the fact that Robinhood said that revenue would be lower in Q3. I think it's important to read that statement in its entirety. And what it says is that Robinhood expected revenues for Q3 2021 to be lower as compared to Q2 2021 as a result of decreased levels of trading activity relative to the record highs in trading activity, particularly in cryptocurrencies during Q2 2021 and expected seasonality. So, Robinhood didn't say it's all about this Dogecoin rally, don't rely on that. All of that revenue is going away in Q3. It also threw in the notion of seasonality as somehow impacting their expected results in Q3 even though there was no disclosure in any of their offering documents with respect to a seasonality impact on the business. But perhaps more importantly, a reasonable investor reading that statement, which all it says is that they expect revenue will be lower. A reasonable investor who's not aware of all of the declines in the financial metrics that had occurred in Q2 would interpret that statement differently than a reasonable investor who was aware of those declines. And indeed, this was borne out in the market. Securities analysts who read the offering documents and issued consensus estimates were not expecting a reversion to the mean of what had happened in 2020, which was essentially what the district court found here. What the securities analysts expected was something, you know, acknowledging the cryptocurrency trading rally in the second quarter, they came forward with consensus estimates that were between Q1 and Q2 2021 revenues. So a reasonable investor who knew that equities trading had declined to a five-quarter low in the second quarter, that options trading had fallen 17%, that cryptocurrency trading volume, which had become Robinhood's primary source of revenue by that point, by Q2, had declined 90% from May to July, would have reviewed these statements and interpreted them differently if they had known all of those facts. And with respect to item 303, we agree that, you know, there's an obligation to disclose both uncertainties and trends. But the notion here that there weren't sufficiently long trends to invoke the item 303 disclosure obligation, we disagree with that. With respect to equities trading revenue, there was an entire quarter where equity trading revenue dropped to a five-quarter low. And then equity trading volume going into the July, the month in which the offering occurred, that continued to be down and significantly down below second quarter levels. And also cryptocurrency trading revenue, that was down 90% across two months going into the month when the offering occurred. So there was a clear item 303 violation here, but there was also a failure to disclose that rendered the offering documents misleading. And where that occurred is with respect to this projected amount of revenue for Q2 2021. Again, they did not disclose the usual breakdown they provided for every other period, financial period discussed in the offering documents for that number, even though they had the information and even though it would have shown significant downward trends and a significant shift in the mix of revenue away from equities and options, which had been the traditional basis for Robinhood's business toward speculative cryptocurrencies. And one last point, your honors, is that yes, Robinhood did disclose that cryptocurrency trading volume and revenue did increase in Q1, but those numbers skyrocketed in Q2. And in fact, cryptocurrency trading revenue became the majority of the transaction-based revenue that Robinhood had during that quarter. So for all of these reasons in Toronto, we believe the district court's opinion should be reversed. All right. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court. That completes our calendar for today. We are in recess until 9.30 a.m. tomorrow morning.  This court for this session stands adjourned.
judges: RAWLINSON, SMITH, Rakoff